## W. S. BANTA, Assignee, Appellant, v. JOHN M. HUBBELL, Respondent.

### Kansas City Court of Appeals, November 11, 1912.

1. **CORPORATIONS: Stockholders Liability: Unpaid Subscriptions.** Plaintiff, assignee of a business corporation, sought to recover from defendant the amount of his unpaid subscription to the capital stock of the insolvent company. Defendant sold his stock to an insolvent person some time prior to the assignment when the company was solvent. *Held*, that as the evidence discloses no intent to defraud on the part of defendant in the transfer of his stock, the assignee could not recover.

2. **———: Shares of Stock: Personal Property.** Shares of stock in a business corporation are personal property, and their owner has the same right to dispose of them as he has over any other personal property, and when a part of the subscription has been left unpaid, the freedom of sale is not impaired until a legal call has been made for such unpaid subscription.

3. **———: ———: Fraudulent Transfer:** A shareholder in an insolvent corporation with knowledge, actual or implied, of such insolvency, is not permitted to sell his shares to a man of straw in order to escape liability on his stock.

4. **———: Assignments: Unpaid Stock Subscriptions.** Unpaid subscriptions of stock, not called in by the directors, are assignable in a general assignment for the benefit of creditors.

5. **———: ———: Equity.** The assignee must assert his right to such unpaid subscriptions in equity because they are not payable to the company until called for by the directors and a court of law cannot compel a call.

6. **CORPORATIONS: When Insolvent.** When a corporation's assets are insufficient to pay its debts, and it has ceased to do business, or has taken, or is in the act of taking, a step which

will practically incapacitate it for conducting its business with reasonable prospects of success, or its embarrassments are such that early suspension and failure must necessarily ensue, then it is insolvent.

Appeal from Boone Circuit Court.—*Hon. N. D. Thurmond*, Judge.

AFFIRMED.

*W. M. Williams, Sebastian & Sebastian* for appellant.

(1) Where a corporation, becomes insolvent it is the duty of the directors to make an assignment for the benefit of creditors. Huse v. Ames, 104 Mo. 91. (2) The assignment dissolves the corporation. Kehlor v. Lademann, 11 Mo. App. 550. (3) All the assets of the assigned corporation, including unpaid balance on stock passes to the assignee, by the deed of assignment, to he held in trust for the benefit of the corporation creditors. Lyonberger v. Bank, 10 App. 499. (4) A corporation is insolvent, when it is not able to pay its debts and the amount paid in on its subscription stock. Jones on Failing and Insolvent Corporations, sec. 9; Shrainka v. Allen, 76 Mo. 384. (5) After the insolvency of the corporation, although the legal owner of the assets may continue as before, the beneficial interest of the stockholder no longer exists. In equity as well as law the beneficial interest belongs to the creditor, and constitutes a trust fund, and the directors become trustees. Thompson on private Corporations, sec. 3259; Williams v. Jones, 23 Mo. App. 114; Gotschalk v. Stover, 85 Mo. App. 569; Miller v. Ins. Co., 50 Mo. 65; Gill v. Balis, 72 Mo. 433. (6) The transfer or attempted transfer by defendants, of their stock to insolvent persons, after the corporation had created debts which it was unable to pay so as to release themselves from

personal liability, for the unpaid balance on their stock, is fraudulent as against the creditors of the corporation. Schufeldt v. Smith, 131 Mo. 290.

*McBaine & Clark* for respondent.

(1)   The finding and decree should be affirmed because plaintiff's petition does not state a cause of action.   Simmons v. Dent, 16 Mo. App. 295; Marks v. Williams Cooperage Company, 204 Mo. 242; Miller v. Insurance Co., 50 Mo. 55, 57.   (2)   The court should affirm the decree below which was for the defendant, because the evidence does not show that the hotel company was insolvent at the time of the transfer of the stock.   Hamilton v. Goodwin, 46 N. W. 563; Sabin v. Fuel Co., 25 Ore. 15.   (3)   Under the evidence the court below properly found for the defendant because the trial court found according to the greater weight of the evidence that the transfer of the stock to Berry by defendant was not made for the fraudulent purpose of avoiding his liability on the same to the creditors of the company.   Miller v. Ins. Co., 50 Mo. 55, 57; Gottschalk v. Stover, 85 Mo. App. 569.   (4)   The directors are under no different obligation from the ordinary stockholder in disposing of their stock.   10 Cyc. 577, 578; Thompson v. Ins. Co., 9 Ont. 308; Trisconi v. Winship, 43 La. Annual, 45; In re Cauley & Co., 31 Am. & Eng. Cor. Cas. 438.

JOHNSON, J.—This is an action prosecuted by the assignee of a business corporation for the recovery of an unpaid subscription to the capital stock.   A similar suit against Charles D. Matthews, another alleged stockholder, was brought in the same court and by stipulation tried with this case.   What we shall say in this opinion will apply with equal force to that case.   A trial to the court resulted in a judgment for the defendant in each case and appeals were taken by plaintiff.

In January, 1910, the Columbia Hotel and Catering Company was incorporated under the provisions of article IX, ch. 12, Revised Statutes 1899, and immediately engaged in the operation of a restaurant in the city of Columbia. The defendant Hubbell was one of the incorporators and directors named in the articles as was also Charles D. Matthews the defendant in the other case. The other incorporators and directors were Benjamin L. Berry and George S. Leighton. The capital stock was two thousand dollars, divided into four hundred shares of the par value of five dollars each and the articles stated that all of the stock was subscribed and one-half paid up. Berry subscribed for one hundred and sixty shares, Matthews and Hubbell for one hundred shares each and Leighton for forty shares. The directors elected Leighton president and manager, Hubbell vice-president, Matthews treasurer, and Berry secretary. Hubbell and Matthews were men of means; Berry and Leighton had no means except their contributions to the capital stock.

The directors held periodical meetings at which there was always a full attendance and at which full reports of the business were submitted by Berry and Leighton who were in active charge of the business. The reports for the first two months disclosed that the business was profitable but after that it became unprofitable and steadily lost money. Without going into details, the statement of the business submitted at a meeting of the board of directors held October 5, 1910, showed that, counting the capital stock paid in as a liability the total liabilities were $2098.38, and the total assets $1703.40. That is to say the corporation owed creditors $1098.38 and had surplus assets of $605.02, but the capital paid in was impaired in the sum of $394.98. The corporation had not defaulted in the payment of its debts and was not being pressed by creditors. Hubbell and Matthews were dissatified

with the management and Berry and Leighton were not in harmony. Each attributed the poor showing of the business to the misconduct of the other and all of the directors were of the opinion that a change of some sort was necessary. The minutes of the meeting of October 5th recite:

"The business of the company was briefly considered, which was found to be on an unprofitable basis and deeply involved. There being no further business to transact the meeting was adjourned . . . for the purpose of reorganizing the company and the transaction of such business as might properly come before the board."

Hubbell and Matthews desired to retire and it seems that both Berry and Leighton aspired to the sole management and control of the business. Berry was the successful contestant in this race. On October 13 he bought the stock of Hubbell and Matthews at par, paying one-half of the purchase price in cash which he procured from sales of some of his own stock and giving his notes for the remainder, payable in sixty days. He secured the payment of these notes by an assignment to each of his vendors of the stock purchased of him. Berry as manager for the corporation continued the business until December 15, 1910 on which date the corporation made a voluntary assignment to plaintiff for the benefit of creditors. The assets at that time were about the same as at the time of Berry's purchase of the stock of Hubbell and Matthews but the liabilities had increased about $400. The capital stock was wiped out and the assets at face value about equaled the liabilities to creditors. Owing to the natural shrinkage in the value of the assets incident to winding up a business under such unfavorable conditions, the debts of the corporation cannot be paid in full without recourse on the stockholders for the unpaid half of the capital stock. All of the persons shown by the books to be stockholders at the

time of the assignment are insolvent and on the theory that the sales of their stock by Hubbell and Matthews to Berry, were invalid, plaintiff seeks to hold them for the payment of their unpaid subscriptions.

Shares of stock in a business corporation are personal property and their owner has the same *jus dispondendi* over them that he has over any other personal property owned by him and in instances where only a part of the stock subscription has been paid and a part has been left unpaid the freedom of sale and transfer is not impaired until a legal call has been made for the payment of the whole or a part of such unpaid subscription. [10 Cyc. 583.]

There is only one restriction on the exercise by a shareholder of his right to sell and transfer shares of stock which have not been fully paid. A shareholder in an insolvent corporation with knowledge actual or implied of such insolvency is not permitted to sell his shares to a man of straw in order to escape liability on the stock. [Simmons v. Dent, 16 Mo. App. 288.] When a corporation becomes insolvent in the sense in which we shall define that term, it is the duty of the directors to make an assignment for the benefit of creditors. [Huse v. Ames, 104 Mo. l. c. 102; Hutchinson v. Green, 91 Mo. l. c. 374.] And its assets, including unpaid stock subscriptions become impressed with the character of a trust fund for the benefit of creditors. Consequently it is uniformly held that a transfer of stock made under such circumstances for the purpose of evading a plain liability to creditors is a fraud and will be set aside either in a statutory proceeding at law prosecuted by a creditor who had exhausted his remedy against the corporation or in a suit in equity prosecuted by the assignee of the corporation. That unpaid subscriptions of stock not called in by the directors are assignable in a general assignment for the benefit of creditors is a proposition about which there can be no serious dispute but such

assets are equitable assets because of the remedy. [Lionberger v. Bank, 10 Mo. App. l. c. 508.] As is said in the case just cited: "The right of the assignee must be asserted in equity because these subscriptions are not payable to the company until called for by the directors and there has been no call and a court of law cannot compel a call. The assent of creditors to an assignment for their benefit will be presumed." The action before us, therefore, must be regarded as one in equity for the collection of a trust fund which the creditors are entitled to have applied in liquidation of the residue of their demands which remained after the exhaustion of the assets received by plaintiff from the corporation.

We come now to the principal issue in the case. Were the sales of stock made to Berry in October, 1910, two months before the assignment, legitimate and lawful sales, made in good faith, or were they made for the fraudulent purpose of escaping the shareholders' liability? The solution of this issue depends on the solution of the question of the intent of the transferrers of the stock and as an intent to defraud generally is incapable of direct proof, since one who attempts to defraud another will seldom hesitate to commit the necessary perjury to sustain the fraud, its existence may be inferred from facts and circumstances. 3 Thompson on Corporations, sections 3260, 3261, where further it is said, p. 2348: "The circumstance that the corporation or the transferree, or both, were at the time notoriously insolvent would, it should seem, be sufficient to warrant the inference of such an intent; and such a circumstance would over-bear the testimony of a single witness. On the other hand, it is obvious that the circumstance that the corporation was 'a going concern,' its solvency unsuspected by the public, would tend to overcome the presumption of fraudulent intent; since in such cases there is, prima facie, an unrestricted right to transfer

Banta v. Hubbell.

to persons capable of taking. Nor is the transferror bound at his peril to know that the transferee is solvent. Such a requirement would put upon the transfer of corporate shares a different rule from that which obtains with reference to the transferability of other property.''

If the corporation was insolvent at the time of the transfer and the transferrers knew it and if the transferee was insolvent and the transferrers knew it, the inference of a guilty intent would be the only one such facts would permit. But if anyone of these elements is lacking the others, at most, can be given no greater effect than that of raising a debatable issue of fact. Thus if the corporation in fact is insolvent but the transferee is solvent and may be compelled to discharge the unpaid liability, the transfer should not be held fraudulent since it could not in any way impair the integrity of the trust fund. On the other hand if the transferee be insolvent and the corporation in fact be solvent and viable, to hold the transfer void could be done only by wholly ignoring the question of intent as well as the right of the owner of property to sell it if he chooses. And further if both the corporation and transferee in fact are insolvent but in appearance and reputation belie that fact and the transferrer is ignorant of the true condition and innocently acts on the presumption that either is solvent, it would be most unjust to hold him guilty of a fraud when no fraud was intended and he was actuated by the bona fide purpose of selling his property.

These considerations disclose that the burden is on plaintiff who is attacking the transfers on the ground of fraud to show either by direct or circumstantial evidence that at the time of the transfers both the corporation and the transferee were insolvent and the transferrers had knowledge of these facts. Speaking of the effect to be given the insolvency of the transferee the Supreme Court say in Miller v. Insurance

Co., 50 Mo. l. c. 57: "If . . . the stockholder shall have honestly and without any intention to defeat the creditors of the company, sold and transferred his stock, the mere fact that the purchaser was insolvent at the time is not sufficient to hold such stockholder still liable for the debts. The question in such case is whether the transfer was fraudulent and void as to the creditors of the company. If the stockholder knew of the insolvency at the time of the transfer it would be very strong evidence of fraud, and it would be hard to resist the conclusion that such transfer was made in bad faith."

The idea expressed in the last sentence of the quotation is intended to refer to cases where the corporation is insolvent or in a failing condition at the time of the transfer and the stockholder with knowledge of the fact transfers his stock to an insolvent purchaser and not to a case where a stockholder in a solvent going corporation sells his stock for a valuable consideration to a purchaser who is execution proof.

Turning to the facts of the present case we think the evidence fails to show that the transferrers had knowledge of the insolvency of Berry the transferree. But we shall not discuss that feature of the case and for present purposes shall concede, *arguendo,* that Berry was insolvent and that the transferrers had knowledge of the fact. With this concession made we still must hold that the evidence, instead of inculpating the transferrers, exonerates them from the imputation of fraud. They had knowledge of the true condition of the corporation but so far as its creditors were concerned,—and the rights of plaintiff are to be measured by the rights of the creditors,—the corporation neither was insolvent nor was it in a failing condition. It had paid its debts as they matured, was able to continue its business and had assets which at their reasonable value to a going concern were sufficient not only to cover its liabilities to creditors but

to equal sixty per cent of its paid-in capital. It appears to be the idea of counsel for plaintiff that the true test of insolvency is the ability of the corporation to pay out of its assets not only the debts of creditors but also the stock liability. That is the true test from the standpoint of the stockholders but not from that of the creditor whose demand must be paid in full before the assets can be applied to the liquidation of the stock liability. When a corporation possesses assets substantially in excess of its liabilities to creditors, is not embarrassed by the demands of creditors and is a going concern, apparently endowed with sufficient resources and vitality to continue its business indefinitely and successfully, it is not insolvent so far as creditors are concerned, though its capital stock be impaired. We feel safe in the assertion that no business corporation embarking in a new business and beginning with a capital derived from subscriptions to stock at par ever began business with an unimpaired capital. The initial expenses are a loss that must be recouped out of future profits and the ordinary business concern is fortunate when its first year's business replaces such losses. Moreover the first year's experience in any new business is largely one of experimentation and endeavor to attain a profitable working basis on which the business may be conducted. In this formative period losses are likely to occur, and to hold that such losses, which are not serious enough to cripple the enterprise to the extent of de-destroying its recuperative vitality, nevertheless, have the effect of stamping the business with the brand of insolvency, would unjustly discourage legitimate and praiseworthy business enterprises and persistency. So long as there is a reasonable prospect of success and the corporation is able to respond to the lawful demands of creditors it should not be pronounced insolvent.

We approve the definition of insolvency in Jones on Insolvent and Failing Corporations, sec. 9: "When it becomes merely 'a nominal inert body,' it may generally be considered an insolvent corporation. In other words, when a corporation's assets are insufficient for the payment of its debts, and it has ceased to do business, or has taken, or is in the act of taking, a step which will practically incapacitate it for conducting the corporate enterprise with reasonable prospect of success, or its embarassments are such that early suspension and failure must necessarily ensue, then such corporation must be pronounced insolvent." To the same effect are the following cases cited by respondent. [Redding v. Godwin, 46 N. W. (Minn.) 563; Sabin v. Fuel Co., 25 Ore. 15; Hamilton v. Quarry Co., 81 N. W. (Wis.) 876.] In the case last cited it is said: "As to creditors the question simply is, has the corporation ample property to pay them, not has it sufficient to pay off every stockholder after payment of its debts to creditors." Tested by this rule the corporation was solvent at the time of the transfer and there can be no question that the transferrers and transferee believed that it was a going concern and with proper management could be placed on a profitable basis. The recital in the minutes of the October meeting of the board obviously took into account the stock liability, but the facts that Berry agreed to pay par for the stock and actually paid half of the purchase price in cash; that he was an experienced and successful caterer; and that the ill success of the business could with justice be ascribed to the mismanagement of his colleague, strongly tend to support the contention of defendants that they, in common with Berry, believed the business could and would be made successful. As we said before, the final question in such case is the intent of the transferrers and we share the view of the learned chancellor that the evidence bespeaks a fair and not a foul intent.

The case was fairly tried and the judgment manifestly is for the right party. Accordingly it is affirmed. All concur.